PLUNKETT-JARRELL GROCERY COMPANY, *et al. v.* TERRY.

5-219                                    263 S. W. 2d 229

Opinion delivered December 14, 1953.

Rehearing denied January 11, 1954.

*Moore, Burrow, Chowning & Mitchell* and *Townsend & Townsend,* for appellant.

*J. B. Milham* and *Kenneth C. Coffelt,* for appellee.

ED. F. McFADDIN, Justice. Appellee, Terry, recovered judgment against appellants because of their conversion of his merchandise, book accounts, and other property. The appellants urge only one point for reversal: i. e., the instructions regarding damages for conversion of the book accounts.

For many years, appellee, A. O. Terry, was a country merchant in Saline County, operating a store and two

sales trucks to adjacent rural areas. On November 22, 1949, Terry went from his store to Little Rock, for the announced purposes of buying merchandise and paying some bills from cash on his person. He visited one or two wholesale houses in Little Rock, and then suddenly disappeared. A diligent search by his family and friends failed to disclose any trace of Terry. It was thought that he had met with foul play; but it now develops that he suffered a claimed attack of amnesia. Some time the latter part of January, 1950, a former friend recognized Terry in a church meeting in Hattiesburg, Mississippi, and called him by name. Terry claims that this act restored his memory and the recollection of his real personality. He returned to his home and family, and later instituted this action against the appellants, Plunkett-Jarrell Grocery Co., Cameron Feed Mills, and Merchants Wholesale Grocery Co.,[1] because of the events that occurred while he was away.

Terry disappeared on November 22, 1949, and at that time, owed the appellants, and other creditors, an aggregate of approximately $9,000.00. The Terry family and the clerks continued to operate the store and sales trucks without any advice from, or consultation with, anyone, until November 29, 1949. On the last mentioned date, Mrs. A. O. Terry and her daughter, Miss Doris Terry, went to Little Rock (whether voluntary or on urgent request from appellants is disputed); and met with representatives of the three appellants and other creditors, to consider the status, and plans for the continued operation, of the Terry business. As a result of that meeting, Mrs. Terry and her daughter signed the following instrument:

"We, Mrs. A. O. Terry and Miss Doris Terry, wife and daughter respectively of A. O. Terry, do hereby agree to operate the A. O. Terry Store, Route 3, Benton, during the absence of A. O. Terry. We agree that we will retain all money received in the business, above the costs

---

[1] One of these appellants is a corporation and the others are partnerships, and some of the partners are sued individually; but these are details unimportant to an understanding of the present issues.

of operation, for the payment of the accounts owed by A. O. Terry.''

It is claimed that by this instrument, and subsequent conduct, the appellants took over the store and all of its assets, and made Mrs. Terry and her daughter the agents of the appellants at all times from and after November 29, 1949. That is the theory on which the plaintiff filed this action for damages.

The store continued to operate until January 10, 1950, when the appellants, as creditors, filed a petition in bankruptcy against A. O. Terry, alleging his insolvency and an act of bankruptcy. Terry returned from his amnesia trip in time to resist the bankruptcy petition. After several hearings, he established that he was not insolvent; and on December 1, 1951, the bankruptcy proceedings were finally dismissed by the Bankruptcy Court. Terry refused to accept a return of any of his assets held by the Receiver in Bankruptcy, and filed this action[2] against the appellants, claiming damages for conversion.

Terry's theory—and confirmed by the Jury verdict herein—was, that the appellant creditors converted his entire stock of merchandise, equipment, notes and accounts, on November 29, 1949, when they placed Mrs. Terry and Miss Doris Terry in charge of the store as their agents. The appellants claim that they acted in entire good faith in an effort to help the Terry family and did not take over the Terry assets, but merely advised and counseled the wife and daughter. But the Jury accepted the theory of A. O. Terry, and rendered a verdict awarding Terry damages against the appellants in amounts as follows:

| "Merchandise | $3,412.29 |
| Open Accounts | $4,500.00 |
| Gault Note & Mortgage | $550.00 |
| Three Trucks | $1,500.00" |

[2] Terry first filed an action in Saline County, but it was dismissed on a question of venue. See *Terry* v. *Plunkett-Jarrell Groc. Co.*, 220 Ark. 3, 246 S. W. 2d 415.

From the judgment on that verdict there is this appeal, and appellants frankly state in their brief herein that insofar as they are concerned: "The only question involved in this appeal is whether there can be a conversion of an open account." Thus, we do not consider whether the creditors actually converted the Terry Assets, or merely acted in an advisory capacity to the Terry family: that question is foreclosed by the Jury verdict and the concession of appellants' counsel, as above quoted.

We come then to the issue of the legal possibility of the conversion of Terry's book accounts; because the Trial Court, over the objection and exception of the appellants, instructed the Jury that if the verdict should be for the plaintiff, then the Jury would fix as an element of damages "the fair market value of the accounts owing plaintiff by store customers not to exceed $9,000.00, the amount sued for, plus 6% interest per annum from date of conversion to date."[3]

In their brief, appellants state their contention as follows:

"Appellants respectfully contend that there can be no action for trover or conversion of an open account. There is not one scintilla of evidence that the books of accounts[4] or accounts receivable were not in Terry's

---

[3] The Court also refused the appellants' instruction, as follows: "You are instructed that even though you find for the plaintiff, you are further instructed that on the issue of conversion of his book accounts or accounts receivable, you will limit his recovery, if any, on that issue to the actual moneys which were collected on said accounts between November 29, 1949, and January 10, 1950, which a preponderance of the evidence herein shows to have been collected thereon and actually paid over or delivered to these defendants." The last part of the instruction just copied was erroneous, because when the jury found there was in fact a conversion by the defendants on November 29, then whether the money was actually *"paid over"* to the defendants would not be the test. Even under the appellants' theory, the test would be the amount actually collected by appellants or their agents.

[4] In the plaintiff's argument, the words are used "open account"; but the uncontradicted evidence here shows that the accounts were "book accounts." There is a *slight* difference between "open accounts" and "book accounts." In 1 Am. Jur. 265, it is stated: "The term 'open account' means, ordinarily, an account based upon running or concurrent dealings between the parties, which has not been closed, settled, or stated, and in which the inclusion of further dealings between the

store from the time of his disappearance until January 10, 1950. They were there for collection by Terry had he been there. The alleged seizure of the accounts receivable by the appellants through their agents, Doris Terry and Mrs. Terry, could in no manner affect the appellee's title to his claims against his customers. They were still claims owing Terry and not the appellants. They could still be collected by Terry and not the appellants. Appellants did not gain title to them by any such alleged seizure or conversion.''

Appellants frankly state that they have been unable to find any Arkansas cases directly in point; but to sustain their views of the applicable law, appellants cite us to *Knox* v. *Moskins Stores,* 241 Ala. 346, 2 So. 2d 449; *Vogedes* v. *Beakes,* 38 App. Div. 380, 56 N. Y. S. 662; and *Ill. Minerals Co.* v. *McCarty,* 318 Ill. App. 423, 48 N. E. 2d 424. Typical of these cases is the quotation from *Knox* v. *Moskins,* as contained in appellants' brief:

'' 'Trover lies only for wrongful appropriation of personal property specific enough to be identified, 39 Cyc. 2011; Cooley on Torts (4th Ed.), p. 496. The term ''accounts'', as here used, means a demand or claim or right of action. It is a mere incorporeal right to a certain sum, or to the collection of a debt. In this sense it has no tangible entity and will not support an action of trover. 1 Corpus Juris 596, § 1, 1 C. J. S. Account, p. 571.' ''

The trouble with the appellants' argument is, that the quotations and statements are borrowed from old cases that were based on the common law forms of action. At common law, every action had to go within the well defined groove prescribed for it, and if the action failed to fit within such groove, then the cause was lost. Some of the old common law actions[5] were

parties is contemplated''; and in 1 Am. Jur. 268, a book account is defined: "A 'book account' may be defined, generally, as an account based upon transactions creating a debtor and creditor relation, evidenced by entries made in a book regularly kept and used for that purpose. A 'book account' is a chose in action, and is property." According to the evidence in the case at bar, the Terry accounts were "book accounts."

[5] In Bouvier's Law Dictionary, there is an article on "Forms of Action," which lists the various common law actions.

trespass, detinue, assumpsit and trover; and *trover* was the name of the tort action that a plaintiff was required to pursue whenever he claimed anyone had taken or converted his property. Unless the plaintiff could fit his evidence into the form of the *trover* action, then he could not maintain *trover,* and would be required to file some other form of action. As to trover, Bouvier's Law Dictionary says:

"A form of action which lies to recover damages against one who has, without right, converted to his own use goods or personal chattels in which the plaintiff has a general or special property. In form it is a fiction: in substance, a remedy to recover the value of personal chattels *wrongfully* converted by another to his own use."

From this definition of trover, it is easy to see why the old common law cases would hold that trover could not be maintained as the proper action for damages for conversion of open accounts; because open accounts were not "personal chattels," and trover could be maintained only for "goods or personal chattels."

An account receivable was intangible, and not susceptible of that possession essential for manual delivery or manual seizure. An account receivable was personal property, but not a "personal chattel." Even in Arkansas today, (except insofar as may possibly be modified by Act 118 of 1945) an open account cannot be assigned so as to allow the assignee to bring action against the debtor without joining the assignor.[6] But even so, an account receivable is property and the owner possesses a property right in it. Our tax assessing laws require that accounts receivable be assessed as property. (§ 84-430 Ark. Stats.) So when we concede that *trover* would not lie at common law[7] for damages for conversion of open

[6] See *Jett* v. *Maxfield Co.,* 80 Ark. 167, 96 S. W. 143; and *Goode* v. *Aetna, etc., Co.,* 178 Ark. 451, 13 S. W. 2d 6.

[7] Prosser on Torts, Hornbook Series, p. 99, in discussing the common law form of action of trover and its change to suit modern conditions, says: "Another ancient restriction, based on the fiction of losing and finding, was that trover would not lie for intangible property because it could not be 'found.' But this venerable limitation likewise has been discarded to some extent by the courts. It is now held that there

accounts, we have not answered the question in this case. This is true because of the matters now to be mentioned.

The old common law form of actions,—i. e., trover and the others—have long since been abolished in Arkansas. In 1869 we adopted the Code of Civil Procedure, and the first section of that Code (now found in § 27-201 Ark. Stats.) says:

"The forms of all actions and suits heretofore existing are abolished; and hereafter there shall be but one form of action for the enforcement or protection of private rights, and the redress or prevention of private wrongs; which shall be called a civil action."

So, even if damages could not be recovered in a *trover* action at common law for the conversion of book accounts, still, if the damages could be recovered in any kind of action, then the damages are recoverable under our code pleading.

As regards the book accounts of the plaintiff, the burden was on him to establish (a) that his book accounts had been converted, and (b) the amount of his damages for such conversion. We have many cases in this State which define "conversion." In *Hooten* v. *State*, 119 Ark. 334, 178 S. W. 310, L. R. A. 1916C, 544, Mr. Justice Hart approved this statement from Cooley on Torts:

"Any distinct act of dominion wrongfully exerted over one's property in denial of his right or inconsistent

may be an action for conversion, not only of the intangible rights represented by special instruments which give control, such as a check, a bill of lading, a bank book, an insurance policy, or a stock certificate, but also of such rights alone, as in the case of the corporate stock apart from the certificate. There is perhaps no essential reason why there might not be a conversion of a debt, the good will of a business, or even an idea, or 'any species of personal property which is the subject of private ownership'; but thus far there has been no particular need for any extension of the remedy beyond commercial securities."

Thus Prosser shows that even in trover, the old common law conceptions have been broadened to meet present day conditions. One of the cases cited by Prosser to sustain the statement that there might be a conversion of a debt is that of *Englehart* v. *Sage*, 73 Mont. 139, 235 Pac. 767, 40 A. L. R. 590, in which it was held that since a debt was subject of garnishment, its wrongful attachment would constitute conversion, for which even trover will lie. There is an Annotation following the reported case in 40 A. L. R. 594. See also Annotation in 50 A. L. R. 1167.

with it, is a 'conversion'. Cooley on Torts, 3rd Ed. Vol. 2, p. 859. 'Anything which is the subject of property, and is of a personal nature, is the subject of conversion.' Id. 856.'[8]

In *Barnett Bros. Mercantile Co.* v. *Jarrett,* 133 Ark. 173, 202 S. W. 474, Chief Justice McCullough approved the following definition of conversion:

" 'The wrongful assumption or dominion over property of another in subversion and denial of his rights, constitutes a conversion of such property, irrespective of whether there was a demand made for the surrender and refusal to surrender said property.' "

In *Thomas* v. *Westbrook,* 206 Ark. 843, 177 S. W. 2d 931, it was recognized that conversion could be constructively accomplished; and Mr. Justice Robins said:

"Conversion is ordinarily said to consist of the exercise of dominion over the property in violation of the rights of the owner or person entitled to possession. The evidence as to appellee's conversion of the market equipment is rather meager, but it seems to be undisputed that he did change the lock on the door of the building in which the property was situated. By so doing he brought about a situation under which appellant, Willard, was denied access to the property and he (Westbrook) alone could enter the building. Such an act was held by the Supreme Court of New Hampshire in the case of *Jones* v. *Stone,* 78 N. H. 504, 102 A. 377, to amount to conversion of chattels within the building."

The evidence in the case at bar established that Mrs. Cooper was Terry's bookkeeper; and she testified that she posted the account book and that in it were listed

---

[8] The same statements are found in Cooley on Torts, 4th Ed., Vol. 2, § 331. We have carefully considered the case of *Gage* v. *Hall,* 126 Ark. 627, 189 S. W. 1062, in which this Court said that there could be a recovery for book accounts. But an examination of the transcript in that case shows that the jury returned a verdict for the amount shown to have been actually collected by the creditor found guilty of conversion. So that case is not authority one way or the other on the questions here at issue. Likewise, we have considered the case of *Bailey* v. *Riggs,* 189 Ark. 456, 74 S. W. 2d 396, which was an action by a note holder against a bank for surrender of a note.

the accounts due Terry from various debtors totalling between $8,000.00 and $9,000.00. The evidence establishes that this book was taken from Terry's store some time after November 29, 1949, and has never been returned to him. When the only evidence Terry had as to the names of his debtors and the items due him by such debtors has been taken from him, certainly there has been a "dominion exercised" over the property of Terry. When the book was taken in the case at bar, it had the same effect as changing the locks on the store had in the quoted case of *Thomas* v. *Westbrook (supra).* When Terry's book containing his accounts was taken, he was effectively denied the ability to establish his claims against his debtors just as thoroughly as if promissory notes executed to him by his debtors had been taken from him. Whether the conversion be considered actual or constructive, there was nevertheless a conversion of his book accounts.

The next point is whether Terry proved his damages for the conversion of these accounts. The Jury verdict awarded him $4,500.00 as such damages; and the evidence clearly supports the verdict. Under date of November 30, 1949, Cameron Feed Mills sent out a letter to all known creditors of A. O. Terry, telling of the meeting of November 29, 1949; and in the said letter to the creditors, Cameron Feed Mills, in giving a list of the assets of the Terry store made from an inventory prepared by representatives of the creditors, listed Terry's accounts receivable as $7,593.82. Mrs. Cooper, Terry's bookkeeper, testified that on November 29, 1949, accounts due Terry (as shown on his books) totalled between $8,000.00 and $9,000.00; that she was familiar with Terry's credit business for many years past; and that 90% of the accounts—on the books on November 29, 1949—were collectible. This and other testimony of a similar nature, supports the Jury verdict of $4,500.00 damages for conversion of the book accounts.

We conclude that under the evidence in this case, the Court was correct in instructing the Jury, as it did, that it could return a verdict for "the fair market value

of the accounts owing plaintiff by store customers'';
and we conclude that the Jury's verdict is supported by
ample evidence.[9]

The appellee attempts to argue in this Court some
claims involving an alleged cross-appeal which arises be-
cause of the failure of the Court to allow the Jury to con-
sider certain items of damage, as claimed by Terry. We
find no merit in the cross-appeal. Without going into all
of the reasons for such decision, it is sufficient to say
that Terry filed no motion for new trial in the lower
Court, setting up such errors as he now seeks to set
up in his cross-appeal, and in the absence of such motion
for new trial, Terry cannot argue the matters in his
claimed cross-appeal. *School Dist. No. 36 of Hot Springs
Co.* v. *Gardner,* 142 Ark. 557, 219 S. W. 11; *Stacy* v.
*Edwards,* 178 Ark. 911, 12 S. W. 2d 901; and *Aetna Life
Ins. Co.* v. *Martin,* 192 Ark. 860, 96 S. W. 2d 327.

The judgment is affirmed on direct appeal and cross
appeal.

GRIFFIN SMITH, Chief Justice, dissenting. The case
is one wherein the law, through judicial delineation, takes
from those who have received substantially nothing as
a consequence of this controversy and gives in plenty to
the plaintiff. The award goes to one whose presump-
tive insolvency and mysterious disappearance would have
prompted any man of reason to proceed as the defendants
did.

The simple story that so clearly gives emphasis to
a penal course of action may be briefly stated in this

[9] We think it not amiss to point out that according to the calcula-
tion made from the evidence, it appears that a substantial sum must
have been collected, or is otherwise unexplained. Mrs. Cooper testified
that on November 29, 1949, the book accounts were between $8,000.00
and $9,000.00. It was shown that on January 10, 1950 (when the Re-
ceiver in Bankruptcy took over the business), the accounts receivable
totalled $6,875.52; but $2,516.27 of that amount was for accounts less
than 30 days old, so these must have come into existence after Novem-
ber 29, 1949, the date of the alleged conversion. Deducting the $2,516.27
from the total accounts of $6,875.52 in existence on January 10, 1950,
there is left $4,359.25 of Terry's old accounts that had not been col-
lected on January 10, 1950. When we take Mrs. Cooper's testimony,
listing the accounts as worth $9,000.00 on November 29, 1949, and show
that only $4,359.25 of them remained uncollected on January 10, 1950,
it leads to the result that $4,640.75 had been collected (or otherwise
unexplained) in the period from November 29, 1949, to January 10, 1950.

way: A rural merchant whose commercial obligations were slightly in excess of nine thousand dollars—takes $3,600 from the assets and silently fades away. Highly reputable wholesalers to whom the merchant was indebted conferred with the Lost Man's wife and daughter. The clear motive of these creditors was to prevent the closing of this strange customer's place of business; so Terry's wife and daughter were put in charge. Perhaps "put" is not a comprehensive word. The two were Terry's closest kin—the ones to whom in any circumstance he would have turned for aid. They, and they alone, continued physical operation of the store. It is said that a jury inferentially found otherwise. The accounts about which so much is said were in their hands. The opinion incorrectly leaves the impression that appellants took the books. How much money these two collected no living man can say. The token payments made for creditor benefits stand as monumental evidence of inefficiency of wife and daughter or failure to account. The business men who are now made to pay almost five thousand dollars for misdirected sympathy received the princely sum of $338 for the benefit of creditors. It is inconceivable that twelve jurors, or even nine of them, should have fixed a liability so completely lacking in all of the elements of justice. I would reverse the judgment and dismiss the cause for want of substantial evidence of conversion.

GEORGE ROSE SMITH, J., dissenting. The majority's effort to show that an open account can be converted by the taking of the creditor's account book seems to me wholly unnecessary. It has long been the rule that choses in action such as an open account cannot be the subject of conversion, but of course this does not mean that the injured person is without a remedy. "Obligations not merged in a document are not the subject of an action to recover damages [for conversion] under the rules stated in §§ 223 to 241, although interference with or appropriation of such obligations may make liable an actor under some other rule of law." Rest., Torts, § 242. Ever since the decision in *Lumley* v. *Gye*, 2 Ell.

& Bl. 216, 118 Eng. Reprint 749, it has been recognized that one who wrongfully interferes with another's contract is liable in tort. I have no difficulty in extending this principle to the wrongful taking of a merchant's account book, but I see no need for distorting the definition of conversion in order to reach the same conclusion.

My principal disagreement with the majority goes to the question of whether Terry proved damage equal to the sum allowed by the jury. On this issue the majority says: "When Terry's book containing his accounts was taken, he was effectively denied the ability to establish his claims against his debtors just as thoroughly as if promissory notes executed to him by his debtors had been taken from him." This speculation may be true; but there is no evidence to support it, and Terry had the burden of proof. He himself testified that ninety per cent of his customers had traded with him on credit for twelve or fifteen years. I rather doubt the validity of the majority's assumption that patrons of such long standing would have unanimously seized upon the absence of the account book as a pretext for repudiating their debts to the store. But in any event the burden of proof was on Terry, and he has not shown the slightest effort to collect these accounts, much less that the loss of the account book has adversely affected the possibility of collection. Thus it will not do to say that the taking of the account book establishes a loss of $4,500 merely because the amount of the open accounts exceeded that sum.

As an alternative to the above theory, which is unsupported by proof, the majority put in Footnote 9 a summary of evidence showing that at least $4,500 may have been collected by some one between November 29 and January 10. This is true, but if the judgment is to rest on that evidence it was plainly error for the court to refuse a requested instruction that would have submitted to the jury the question of the amounts actually collected.

In Footnote 3 the majority conclude that this instruction was erroneous for the reason that it limited Terry's recovery to the sums collected and paid over to the defendants, the implication being that the defendant.: would also be liable for money collected by their agents but not paid to them. In the circumstances this limitation was entirely proper. The facts are that the agents in question were Terry's wife and daughter, who alone collected accounts during Terry's absence. Terry's own theory of his case, as reflected by his pleadings and his proof, has never included the notion that he was seeking to recover amounts collected by his family and retained by them. No such suggestion has been made by counsel, nor could it have been advanced in this court for the first time. Yet the affirmance of the judgment upon the premise contained in Footnote 9 amounts to saying that the jury, in disregard of both the pleadings and the evidence, undertook to unjustly enrich the Terry family by permitting Terry to recover for amounts collected by his wife and daughter and not paid over to the defendants. I think the requested instruction would have fairly submitted to the jury the real issue that was in controversy, so that its refusal constituted reversible error.

SAM ROBINSON, Justice, dissenting. There is no evidence in the record that would justify submitting to a jury the issue of conversion on the part of the creditors. Terry disappeared November 22, 1949; his wife and daughter and Mrs. Cooper, a trusted employee, took over the business for Terry. In the circumstances they would have been derelict in their duty if they had failed to take charge of the business. In fact, they never permitted the store to close; they caused it to stay open and took complete charge, continuing to sell merchandise and collect accounts. It was more than a week after Terry's disappearance that the creditors conferred with the wife and daughter. At that time the wife and daughter were in full charge.

Terry had committed an act of bankruptcy; the creditors could have filed an involuntary petition in

bankruptcy, but instead of doing this they decided to go along with the Terrys to see if the matter could be worked out. The Terrys paid them $338.00 and the creditors offered certain suggestions as to how the business should be operated; but according to the undisputed evidence, the creditors have never received one penny in money or property except that which was paid to them by the wife and daughter, and this was used in the bankruptcy case and refunded to Terry at the termination of the bankruptcy proceeding.

After it was ascertained that the wife and daughter were not going to be able to pay the debts, a bankruptcy proceeding was instituted. The only thing taken out of the store by the creditors was a list of the accounts copied from the records in possession of Terry's family, who undoubtedly were acting as Terry's agents at the time. Not to this day has Terry complained of the wife and daughter taking over immediately upon learning of his mysterious disappearance. No one contends that a mere list of names with the amounts owed copied from the account books is property subject to a conversion.

In giving plaintiff's instruction No. 1 the court erred in assuming the wife and daughter were not acting as agents for Terry. This was over the specific objection of the creditors. Defendants were entitled to an instructed verdict; this was requested. Hence the creditors' requested instruction submitting the issue of conversion does not preclude them from now raising the issue of there being no evidence to sustain a verdict finding a conversion. If it can be said now that appellants are limited to the question of whether there can be a conversion of a chose in action, their position is still not untenable, because at the time a motion was made for a directed verdict it should have been granted on the ground that there was no evidence to sustain a verdict for conversion. A bare list of accounts copied from the original which was left in the hands of Terry's agents, his wife and daughter, is not property which is subject

to conversion. Therefore appellants' argument that the only issue is whether such a list is convertible is sound.

In my opinion the cause should be reversed and dismissed.