484 A.2d 1013

Stephen R. HIMELFARB

v.

AMERICAN EXPRESS COMPANY.

No. 41, Sept. Term, 1984.

Court of Appeals of Maryland.

Dec. 13, 1984.

David J. Perrone, Bethesda, for appellant.

Barry E. Gordon, Rockville (Ronald S. Canter and Wolpoff & Abramson, Rockville, on the brief), for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C.

MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This case involves applying the statute of limitations to an action on a credit card account containing a disputed debit. We shall hold that the cause of action accrued more than three years before the card issuer filed suit against the cardholder. We shall also conclude that the cardholder did not acknowledge the disputed debit by making part payments and that the statute was not tolled while the card issuer investigated the dispute in a manner similar to that which the Federal Fair Credit Billing Act would have required, if applicable.

In 1973 American Express Company (Amexco) and Stephen R. Himelfarb (Himelfarb) of Rockville, Maryland entered into an agreement relating to a credit card issued by Amexco to Himelfarb. On August 13, 1978, at a jewelry store in Atlantic City, New Jersey, Himelfarb used the credit card to purchase a specific ring at a cash price of $3,596 for delivery by mail to the home of Himelfarb's then fiancee. His fiancee participated in selecting the ring, which had a cluster of diamonds and was to be an engagement ring. The face of the jewelry store's sales slip, just above Himelfarb's signature, contained a legend reading, "NO REFUNDS. MERCHANDISE EXCHANGES ONLY. RECEIPT MUST ACCOMPANY RETURNS." At trial Himelfarb and the young woman, who meanwhile had married someone else, each testified that they were orally assured by the store manager that the ring could be returned and the price refunded. This assurance was said to have been obtained because the fiancee was uncertain whether she preferred the cluster to a solitaire setting. The ring, sized for the fiancee, arrived from the jeweler about one week after the sale. For reasons which are not material to the decision of this case, Himelfarb mailed the ring back to the jeweler on September 12, 1978, with the request that a credit be processed to his Amexco account.

The first statement from Amexco to Himelfarb containing the $3,596 purchase was that for the billing period ending September 26, 1978 (the September statement or bill). On receipt of that statement and at a time which, under the evidence most favorable to Amexco, was not later than Monday, October 2, 1978, Himelfarb telephoned American Express "Customer Service." [1] It is uncontradicted that in this conversation Himelfarb told Amexco that the ring had been purchased on approval, that he had returned the ring to the jeweler, and that he "would not be paying for it . . . ." He never has.

Amexco entered an "Adjustment—Interim Credit" to Himelfarb's account and investigated the matter with the jeweler. When Amexco received a copy of the sales slip which Himelfarb had signed, it wrote to Himelfarb and advised that the interim credit would be reversed. The $3,596 charge for the ring was again posted to Himelfarb's account on January 2, 1979, and it appeared on the periodic statement sent to Himelfarb for the billing cycle ending January 25, 1979.

At some point prior to February 15, 1979, the jeweler had again sent the ring to Himelfarb, but on that date Himelfarb mailed the ring back to the jeweler. He continued, without success, his efforts to obtain a credit for the price of the ring on his Amexco account.

On or about August 13, 1981, Amexco sued Himelfarb in the Superior Court of the District of Columbia. The instant suit by Amexco against Himelfarb was filed on October 5, 1981, in the District Court of Maryland sitting in Montgomery County. Himelfarb had raised an objection to suit

---

1. The outside date testified to by Himelfarb was October 1, 1978. In 1978 October 1 was a Sunday.

   There was no evidence directed to the length of time between the close of a billing cycle and the mailing of a cardholder's statement for that cycle. The trial judge was not asked to draw any inferences about delay in billing and he did not do so. Consequently Himelfarb's testimony giving the date of the telephone call is uncontradicted and it is not inherently unbelievable.

against him in the District of Columbia and that action was ultimately dismissed on April 19, 1982. In the Maryland action Himelfarb immediately raised the defense of limitations, which was rejected at a pretrial hearing. No court record of the reasons for that ruling has been supplied to us.

At trial Amexco's only witness was a custodian who produced the records of Himelfarb's account for the period September 1978 through February 1979. A composite of these records is attached as an appendix. Amexco did not present account records for March through June 1979. A delinquent account record from Amexco picks up Himelfarb's balance in July 1979 at $3,927.10, a figure which that exhibit reflects as a constant for each month thereafter through December 1979. Consequently the computation of the outstanding balance of $3,927.10 is not in evidence. Amexco's witness, however, agreed on cross-examination that, based on records at which he had looked, it "would appear" that every purchase charged to Himelfarb's account, other than the ring, had been paid.

Himelfarb renewed his limitations defense at trial but it was again rejected. The trial judge concluded "that there were negotiations and communications and no definite ascertainment that the debt was in fact a closed debt" prior to October 5, 1978. On April 14, 1983, the District Court entered judgment in favor of Amexco for $4,359 plus costs and an attorney's fee of $589.06.

On Himelfarb's appeal on the record the Circuit Court for Montgomery County affirmed. That court gave three reasons for its conclusion that limitations had not run: (1) The ring had not been "finally charged" until early 1979; (2) Himelfarb's part payments on the account started limitations running anew on the entire account balance; and (3) under the Fair Credit Billing Act "[u]ntil [the creditor] makes the correction or gives written explanation the creditor is prohibited from taking action to collect the disputed amount."

We granted Himelfarb's petition for certiorari. His issues as we restate them are:

1. Did Amexco's cause of action for the $3,596 charge for the ring accrue prior to October 5, 1978?

2. If so:

A. Did any of Himelfarb's part payments on the account renew the running of the full three years' limitations period; or

B. Does the Fair Credit Billing Act's prohibition against collection of a disputed debit before the creditor notifies the consumer of the decision on a claimed billing error toll the running of the statute of limitations?

I

■ Md.Code (1974, 1984 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article (Courts Article) provides that "[a] civil action at law shall be filed within three years from the date it accrues ...." When accrual occurs "is left to judicial determination." *See Goldstein v. Potomac Electric Power Co.*, 285 Md. 673, 684, 404 A.2d 1064, 1069 (1979). "In contract cases, the general rule is that the period of limitations begins to run from the date of the breach, for it is then that the cause of action accrues and becomes enforceable." *Mayor of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157, 338 A.2d 275, 280, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975). In the instant case Himelfarb's breach of contract occurred upon failure to pay Amexco when he had promised that payment would be made.

Time for payment to Amexco by Himelfarb as a "Member," *i.e.*, cardholder, is governed by ¶ 2 of the credit card agreement. In relevant part it reads:

Member ... shall pay to Amexco the amount of any and all purchases charged to the account together with all annual and other fees ("Charges") immediately upon receipt of Amexco's monthly statement of Charges ....

Each "Statement of Account" sent by Amexco to Himelfarb contained the preprinted statement "Payable on Receipt in U.S. Dollars." This is set forth immediately to the left of the computer printout of Himelfarb's name and address. Further, at the top of the September statement, which contained the initial billing for the ring, appears the following computer-printed statement: "TERMS—PAYABLE IN FULL UPON RECEIPT OF STATEMENT." Consequently Himelfarb's payment of the $3,596 was to be made "immediately upon receipt" of the statement.

We need not here decide whether or to what extent there may be any elasticity in complying with the terms "immediately upon receipt." The evidence is uncontradicted that after Himelfarb had received Amexco's September bill and prior to October 5, 1978, Himelfarb took the position with Amexco that he would not pay for the ring. If Himelfarb's contractual duty to pay the new balance on the September statement had arisen prior to his telephone call to Amexco, then he had already breached his contract and Amexco's cause of action for the September new balance had accrued by the time of the call. If Himelfarb's duty to pay "immediately upon receipt" had not yet arisen when he spoke by telephone to Amexco, his announced refusal to pay for the ring was an anticipatory breach of his promise when payment was imminent. *See generally C.W. Blomquist & Co. v. Capital Area Realty Investors Corp.*, 270 Md. 486, 311 A.2d 787 (1973); *String v. Steven Dev. Corp.*, 269 Md. 569, 307 A.2d 713 (1973); *Weiss v. Sheet Metal Fabricators, Inc.*, 206 Md. 195, 110 A.2d 671 (1955). When Himelfarb admitted to Amexco his receipt of the September bill and stated he would not pay $3,596 of it, Amexco was in a position at that time to prove the essential elements of an action on the account. *See James v. Weisheit*, 279 Md. 41, 44, 367 A.2d 482, 484 (1977).

The rulings in the courts below intimated that accrual of an action on the credit card agreement was postponed in this case because Himelfarb asserted a right to return the ring which would wipe out the debit to his account. This

did not defer the time of accrual. From the standpoint of the Maryland common law of contracts, Himelfarb's claimed defense is as ineffective to prevent accrual of the creditor's cause of action as is a debtor's statement that he mailed a check in full payment which the creditor should have received, or that his signature on a document evidencing the obligation is unauthorized, or that he is excused from paying because of material breach in the creditor's performance. The limitations clock begins to tick while the creditor is deciding whether an asserted defense is meritorious.

## II

Amexco next argues that the three-year period had not expired by October 5, 1981, because part payments made by Himelfarb on the account after October 5, 1978, started new periods of limitations running as to the entire outstanding balance. The general principle Amexco relies upon is described in 1A A. Corbin, *Corbin on Contracts* § 217, at 301–03 (1963).

> The making of a part payment on account of a larger claim then identified and not denied, justifies the inference of a promise to pay the balance and revives an enforceable right to that balance. This is true whether the payment is made to be applied toward either the principal debt or interest thereon. If the payment is made before the statutory period has fully expired, the implied promise starts a new period running in place of the partly expired one. The new period begins from the day of payment. The debtor can, by any appropriate expression, prevent the inference of a promise to pay the balance. Such is the case if he says, "I pay you this but will pay no more." [Footnotes omitted.]

Part payment on an open account, made within three years of suit, does not in and of itself take the suit out of the statute of limitations. In *Beltzhoover v. Yewell,* 11 G. & J. 212 (1840) the trial court's jury instruction that part payment had taken the claim out of the statute resulted in

reversal of judgment for the creditor. The rule as laid down in that case is that

> [t]o revive the items of an open account, which are barred by the statute, by a payment in part ... it is necessary that it should appear, that the payment was made on those items, or that the debtor having full knowledge of charges in the account, to which the statute was a bar, made the payment, recognizing its validity. [*Id.* at 216.]

The debtor in *Beltzhoover* had not even been furnished a copy of the running account when he made the part payment.

The effect on limitations of a part payment was also the central issue in *Ryan v. Canton Nat'l Bank*, 103 Md. 428, 63 A. 1062 (1906). In a suit filed August 11, 1904, plaintiff claimed for the reasonable value of services rendered for the defendant bank from February 27, 1899, to March 21, 1901. On August 22, 1901, the bank paid plaintiff $1,000 which the bank considered to be a bonus. The plaintiff viewed the $1,000 as a part payment and similarly characterized as part payments the monies which the bank had paid to him contemporaneously with his rendering the services. This Court affirmed a directed verdict for the bank entered on limitations grounds. We quoted from H. Wood, *A Treatise on the Limitation of Actions at Law and in Equity* § 97, at 221–22 (1st ed. 1883), where the author states that

> "[i]n order to make a money payment a part payment within the statute, it must be shown to be a payment of a portion of an admitted debt, and paid to and accepted by the creditor as such, accompanied by circumstances amounting to an absolute and unqualified acknowledgment of more being due, from which a promise may be inferred to pay the remainder." [103 Md. at 447, 63 A. at 1066.]

After noting that the foregoing principles were supported by the leading case of *Tippets v. Heane*, 1 Cromp., M. & R. 252, 40 Rev.Rep. 549 (1834), we reproduced in its entirety

Baron Parke's opinion in that case. He ruled that, in order for part payment on account of the debt for which the action is brought to avoid limitations, it is necessary for the creditor

"to show that the payment was made as part payment of a greater debt, because the principle upon which a part payment takes a case out of the statute is, that it admits a greater debt to be due at the time of the part payment. Unless it amounts to an admission that more is due, it can not operate as an admission of any still existing debt." [103 Md. at 448, 63 A. at 1066.]

And *see Mills v. Fowkes*, 5 Bing.N.C. 455, 50 Rev.Rep. 750 (1839), which applies *Tippets, supra*, and from which we also quoted with approval in *Ryan v. Canton Nat'l Bank*, *supra*, 103 Md. at 448, 63 A. at 1066.

■ Whether a part payment operates as an admission of the whole or some part of a greater debt depends on the facts in a given case. For example, in *Hutton v. Marx*, 69 Md. 252, 255, 14 A. 684, 684 (1888) we said that

if within three years before the bringing of the suit, the defendant had admitted a single item of the plaintiffs' account to be due, the plea of limitations would have been defeated as to that item, while it would have been a good bar to all the other items in the account.

■ When these principles are applied to the facts in the instant case, it is clear that the part payments which Amexco proved do not support an inference that Himelfarb admitted liability for the purchase price of the ring. As reflected in the running account presented in the appendix, the $3,596 was not even reflected in Himelfarb's account as billed when he made part payments of $61.06 and $182.11 during the billing cycle ending December 27, 1978. Even if we assume that before Himelfarb made the payment of $182.11 credited by Amexco on December 26, 1978, Amexco had advised Himelfarb that the conditional credit of $3,596 was going to be reversed, it is still obvious that Himelfarb intended the $182.11 to be applied in complete satisfaction

of the identical amount representing total purchases charged to the account in the billing period ending November 24, 1978.

The $3,596 debit does appear on the billing statement for the period ending January 25, 1979, and there is a payment of $20.36 from Himelfarb credited by Amexco on January 27, 1979, which is reflected on the statement of account for the period ending February 22, 1979. Once again, that $20.36 was unmistakably intended to pay the two debits totaling $20.36 which comprised the new balance for the billing period ending December 27, 1978. Far from indicating an acknowledgment that the payments were part of a larger debt due from Himelfarb to Amexco, the amounts paid, both in relation to the items in the open account and against the background of Himelfarb's declared intent not to pay for the ring, evidence the intent to avoid any part payment on the $3,596 item. Nothing in the case contradicts that intent. There was no evidence in this case sufficient to permit part payment to take Amexco's claim out of the statute.[2]

### III

■ The final issue is what effect, if any, the Federal Fair Credit Billing Act, 15 U.S.C. § 1666 *et seq.* (1982) (the Act) has on limitations in this case. Section 1666(a) essentially provides that "[i]f a creditor [timely] receives at the address disclosed under section 1637(b)(10) of this title a *written*

---

·**2.** Amexco presented its case exclusively on the theory that limitations had not run on the entire balance claimed, considered as a lump sum. Because Amexco did not put into evidence records of the running account after February 1979, we cannot conclusively determine whether all of the purchases charged after October 5, 1978, have in fact been paid or whether limitations had not run on some unpaid purchases first billed by Amexco after October 5, 1978. But we shall not remand inasmuch as Amexco had the opportunity to present proof, if any, that purchases other than the ring remained unpaid. Any such proof would have enabled the trier of fact to apply the account agreement under which the first monthly billing for a purchase determines when an action accrues for the debit to the account for the price of that purchase.

notice ... from the obligor in which the obligor" claims a billing error, the creditor shall do certain things "unless the obligor has, after giving such *written* notice and before the expiration of the time limits herein specified, agreed that the statement was correct ...." (Emphasis added.) Duties imposed on the creditor include either making appropriate corrections in the account or sending a written explanation why the creditor believes the billing was correct "not later than two complete billing cycles of the creditor (in no event later than ninety days) after the receipt of the notice and *prior to taking any action to collect the amount, or any part thereof* ...." § 1666(a)(B) (emphasis added). Amexco contends that this prohibition against collection tolled limitations or prevented any cause of action for the purchase price of the ring from accruing. On this analysis, because the prohibition under the Act remained in effect until December 1978 when Amexco notified Himelfarb of its position, this suit was timely filed.

We do not reach the interplay, if any, between the Act's prohibition and this state's statute of limitations because the Act does not apply to the transaction at issue in the case before us. Himelfarb's notice to Amexco was oral, by telephone. Section 1666(a) explicitly requires a written notice. In the implementing regulations a billing error notice is described as "a written notice from a consumer ...." 12 C.F.R. § 226.13(b) (1984) (footnote omitted).

An oral notice from an obligor to the creditor does not trigger the operation of the Act, including the prohibition against collection. Illustrating the point is the Federal Reserve Board correspondence of April 13, 1976, No. 1026, [Truth-in-Lending Special Releases and Correspondence 1974–1977] Consumer Credit Guide (CCH) ¶ 31,366. A creditor proposed informing customers on periodic statements that they might raise questions concerning those statements by telephone, but that telephone inquiries would not preserve the customers' rights under the Act. Staff advised that "[s]o long as the reference to a telephone number does not confuse the customer nor lead the customer to

believe that telephone inquiries will preserve his rights under the Act, staff believes that a telephone number could be included on the material provided." *Id.* at 66,634. The same warning that telephone notice by the obligor will not preserve rights under the Act may be found in the current regulations requiring, at the time an open-end credit account is established, that the creditor disclose, *inter alia,* rights under the Act. *See* 12 C.F.R. § 226.6(d) and app. g thereto.

What has occurred in the instant case is that, in response to Himelfarb's telephone call, Amexco voluntarily complied with the Act's requirements as a matter of Amexco's own business policy and customer relations. But Amexco's voluntary compliance does not cause the Act to operate on the billing of the ring. More important, Amexco's voluntary compliance does not engage the gears of the Act with the gears of the Maryland law of limitations. From the standpoint of Maryland's law of limitations, Amexco's voluntary compliance with the Act is an entirely neutral circumstance.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY VACATED, AND CASE REMANDED TO THAT COURT FOR THE ENTRY OF AN ORDER VACATING THE JUDGMENT OF THE DISTRICT COURT OF MARYLAND AND REMANDING THIS CASE TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF STEPHEN R. HIMELFARB. COSTS IN THIS COURT, IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, AND IN THE DISTRICT COURT OF MARYLAND TO BE PAID BY AMERICAN EXPRESS COMPANY.

Appendix

| Previous Balance | Payments | | Credits | Purchases & Charges | New Balance | Closing Date |
|---|---|---|---|---|---|---|
| $ 40.97CR | $ | | $ | $3,596.00 | $ | |
| | | | | 8.94 | | |
| | | | | 9.82 | | |
| | | | | 2.76 | | |
| | | | | 3,617.52 | 3,576.55 | 9/26/78 |
| 3,576.55 | | | 3,596.00 [1] | 13.39 | | |
| | | | | 9.72 | | |
| | | | | 18.30 | | |
| | | | | 14.10 | | |
| | | | | 25.00 | | |
| | | | | 80.51 | 61.06 | 10/26/78 |
| 61.06 | | | | 33.80 | | |
| | | | | 9.19 | | |
| | | | | 7.00 | | |
| | | | | 46.44 | | |
| | | | | 85.68 | | |
| | | | | 182.11 | 243.17 | 11/24/78 |
| 243.17 | 61.06 | (11/27) | | 5.45 | | |
| | 182.11 | (12/26) | | 14.91 | | |
| | | | | 20.36 | 20.36 | 12/27/78 |
| 20.36 | | | | 141.75 | | |
| | | | | 19.00 | | |
| | | | | 3,596.00 [2] | | |
| | | | | 12.87 | | |
| | | | | 2.17 | | |
| | | | | 3.43 | | |
| | | | | 3,775.22 | 3,795.58 | 1/25/79 |
| 3,795.58 | 20.36 | (1/27) | | 73.50 | 3,848.72 | 2/22/79 |

---

1. "Adjustment—Interim Credit 10/25."

2. "Adjustment—Reversal of Interim Credit. Date of Above 01/02."